```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
JOHN DEERE SHARED SERVICES, INC.,                                       :
                                                                        :
                                Plaintiff,                              :     15-CV-1146 (JMF)
                                                                        :
            -v-                                                         :     OPINION AND ORDER
                                                                        :
SUCCESS APPAREL LLC, et al.,                                            :
                                                                        :
                                Defendants.                             :
                                                                        :
------------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/30/2015

JESSE M. FURMAN, United States District Judge:

Plaintiff John Deere Shared Services, Inc. ("Deere" or "Plaintiff") brings this diversity action against Defendants Success Apparel LLC ("Success"), Americo Group Inc. ("Americo"), and Success's Managing Member and Chief Executive Officer, Gila Goodman ("Goodman," and together with Success and Americo, "Defendants"), alleging breach of contract, fraudulent conveyance, and alter ego claims.  Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants move to dismiss all of Plaintiff's non-contract clams.  For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

In considering a Rule 12(b)(6) motion, a court is limited to the facts alleged in the complaint and is required to accept those facts as true.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).  A court may, however, consider documents attached to the complaint; statements or documents incorporated into the complaint by reference; matters of which judicial notice may be taken, such as public records; and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit.  *See, e.g.*,

*Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (applying that rule to district courts). Accordingly, the following facts are taken from the Second Amended Complaint ("Complaint" or "SAC"), exhibits incorporated by reference therein, and documents of which the Court may take judicial notice.[1]

Plaintiff is a subsidiary of Deere & Company, which owns and licenses trademark rights in the John Deere brand. (SAC (Docket No. 27) ¶¶ 1-3). On December 1, 2010, Plaintiff entered into a license agreement (the "License Agreement") with Success, a manufacturer of children's clothing, allowing success to use certain John Deere trademarks. (*Id.* ¶¶ 5, 22-24, Ex. B). In exchange for use of Plaintiff's trademarks, Success agreed to pay to Deere monthly royalties calculated as a percentage of net sales of the licensed products. (*Id.* ¶ 25). Plaintiff alleges that, for three months in 2014, Success failed to pay the royalties required by the License Agreement (which was originally to last three years, but was subsequently extended) and, on that basis, brings breach of contract claims against Success. (*Id.* ¶¶ 24, 28, 38). Those claims are not challenged in Defendants' motion to dismiss, however, which is limited to the claims brought against the other two Defendants: Goodman, the Managing Member and Chief Executive Officer of Success, and Americo. (*Id.* ¶¶ 51-125, 153-205). Those claims relate generally to three transactions. Accordingly, it is to those transactions that the Court turns.

First, Plaintiff alleges claims relating to a transaction between Success and Americo, a manufacturer of sportswear and loungewear. (*Id.* ¶ 51). On August 30, 2013, Americo agreed to purchase certain assets from Success in an Asset Purchase Agreement (the "APA"). (*Id.* ¶¶ 52-

---

[1] Defendants submit a declaration from Goodman dated June 25, 2015. (*See* Decl. Supp. Defs.' Mot. To Dismiss Counts Six Ten Second Am. Compl. (Docket No. 30)). As it is not among the materials that a court may consider on a motion to dismiss, the Court gives it no consideration.

59; Decl. Supp. Defs.' Mot. To Dismiss (Docket No. 12) ("May 15 Goodman Decl."), Ex. A ("APA")).  Plaintiff alleges that, through the APA, "Success conveyed all or substantially all of its corporate assets to Americo" (the "Success-Americo Conveyance").  (SAC ¶ 52).  In particular, Deere alleges that Americo purchased three groups of assets defined as the "Transferred Assets": assets related to Success's business with the retailer Target, business being conducted under a license with Eddie Bauer, and Success's "Private Label Business."  (*Id.* ¶ 54).  Additionally, Success assigned to Americo its rights in "all of the trademark registrations that it owned, as well as the goodwill of its business associated with those trademarks."  (*Id.* ¶ 55; s*ee id.* Ex. F).  The APA further required that certain employees of Success accept employment with Americo.  (*Id.* ¶ 56).  In exchange, Americo was required to pay Success $2,250,000.  (*Id.* ¶ 57).  As additional consideration, Americo agreed to make quarterly payments (called "Earn-Out Payments"), through 2017, of 1.5% of its net sales of products sold in connection with the Transferred Assets.  (*Id.* ¶ 58).[2]

---

[2]   On first glance, some allegations in the Complaint appear to be contradicted by the terms of APA, which is incorporated by reference into the Complaint. (SAC ¶ 53). For example, the APA appears to define "Transferred Assets" differently than in Plaintiff's SAC.  Section 1.1 of the APA defines the term to encompass only the Target business and assets necessary to conduct the Target business. (APA ¶ 1.1).  Moreover, Section 1.2 of the APA, titled "Excluded Assets," explicitly lists lines of business — including the Eddie Bauer license "and the business conducted under the Eddie Bauer License" — that were *not* transferred to Americo. (*Id.* ¶ 1.2). Only in the escrow provision, which provides that a portion of the purchase price is to be held in escrow pending Americo's entering a licensing agreement with Eddie Bauer, does it become apparent that the Eddie Bauer license was part of the deal. (*Id.* ¶ 1.6.2).  Further, the APA provides that Success was to receive earn-out payments not only on the Target business, but also on business related to the Eddie Bauer license and the Private Label Business. (*Id.* ¶ 1.6.3). How the Private Label Business relates to the deal is even less clear, as there is no provision explicitly stating that Success was conveying that business to Americo.  But various provisions refer to the "Businesses" (a term that, rather unhelpfully, is not defined in the contract) that were to be conveyed from Success to Americo. (*See, e.g.*, *id.* ¶¶ 1.3, 5.1(i)).  In short, the APA is not a model of clarity.  Given that, and given that the Court must draw all reasonable inferences in Plaintiff's favor, the Court credits the SAC's allegations for purposes of this motion.

Significantly, in connection with the APA, Success also entered into an agreement with its secured creditor, Wells Fargo Trade Capital Services, Inc. ("Wells Fargo"). (*See id.* ¶¶ 72-75). Prior to Americo's purchase of Success's assets, Wells Fargo held a lien on all of Success's assets, including those conveyed to Americo. (*Id.* ¶ 72). As Success's secured creditor, Wells Fargo consented to the APA in a concurrent agreement through which Wells Fargo released its lien on the Transferred Assets (the "Wells Fargo Agreement"). (*Id.* ¶ 73; May 15 Goodman Decl., Ex. B ("Wells Fargo Agreement")). In exchange for releasing its lien, Wells Fargo was to receive the purchase price, as set out in the APA, of $2,250,000 and would be "paid . . . directly" all Earn-Out Payments. (Wells Fargo Agreement ¶¶ 3-4). Plaintiff alleges that after the Success-Americo Conveyance, Wells Fargo took a new lien on some of the Transferred Assets then owned by Americo. (SAC ¶ 73).[3]

Two other transactions or payments at issue here took place in or shortly before May 2014. First, in May 2014 — according to Success's profit-and-loss statement for that month (the "P&L Statement") — Americo paid Success $34,757.36 (the "May Transaction"). (*Id.* ¶ 59). Plaintiff alleges that this payment was either (1) the Earn-Out Payment for the first quarter of 2014 (and, based upon a calculation of quarterly earnings, an indication that the consideration given for the Success-Americo Conveyance was not fair) (*id.* ¶¶ 62, 64); or (2) constituted a sale (or, more precisely, a fraudulent conveyance) of Success's Deere-branded licensed products to Americo, (*id.* ¶¶ 84, 157, 160). Second, the P&L Statement shows that, between January and

---

[3]   Defendants argue that Deere's allegation regarding Wells Fargo's new lien on the Transferred Assets is contradicted by the Wells Fargo Agreement and the APA because neither contains such a provision. (Reply Mem. Law Further Supp. Defs.' Mot. To Dismiss Counts Six Ten Pl.'s Sec. Am. Compl. (Docket No. 35) ("Defs.' Reply") 4). Defendants, however, confuse silence for contradiction; nothing in the actual Wells Fargo Agreement or APA appears to contradict Plaintiff's allegations, and thus the Court credits the allegations.

May 2014, Success paid various expenses — administrative payroll payments, fringe benefit payments, and travel and entertainment expense payments — totaling approximately $597,000 (together, the "May Expense Payments"). (*Id.* ¶ 96). Plaintiff alleges that Goodman caused those payments to be made either to herself or to Bruce Fine — at the time, the only other employee of Success — for little or no consideration. (*Id.* ¶¶ 94-95).

Based on the foregoing, Plaintiff brings contract and quasi-contract claims against Success (Counts One through Five); a fraudulent conveyance claim against Success based on the three transactions described above (Count Six); a contract claim against Americo, on the theory that it is liable as Success's successor (Count Seven); a fraudulent conveyance claim against Americo for the Success-Americo Conveyance and the May Transaction (Count Eight); a contract claim against Goodman, on the theory that she is liable as Success's alter ego (Count Nine); and a fraudulent conveyance claim against Goodman for the May Expense Payments (Count Ten). Defendants move to dismiss Counts Six through Ten.

## LEGAL STANDARDS

In evaluating a motion to dismiss, the Court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely

on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

As noted, Defendants move to dismiss only Counts Six through Ten — namely, the fraudulent conveyance claims (brought against all three Defendants), the alter ego claim (brought against Goodman), and the successor liability claim (brought against Americo).  The Court will address the claims in that order.

### A.     The Fraudulent Conveyance Claims

First, Plaintiff brings fraudulent conveyance claims against all three Defendants based on the transactions discussed above: the Success-Americo Conveyance, the May Transaction, and the May Expense Payments.  Pursuant to New York's Debtor and Creditor Law ("DCL"), which the parties agree applies here (*see* Mem. Law Supp. Defs.' Mot. To Dismiss Counts Six Ten Pl.'s Sec. Am. Compl. (Docket No. 29) ("Defs.' Mem.") 13); Pl.'s Mem. Law Opp'n Defs.' Mot. To Dismiss Counts Six Ten Pl.'s Sec. Am. Compl. (Docket No. 34) ("Pl.'s Mem.") 11-16), a conveyance may be found fraudulent as to a creditor if it is made with actual or constructive fraudulent intent.  *See, e.g.*, *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005); *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 247 (1st Dep't 1999).  A conveyance is "actually fraudulent, without regard to the adequacy of consideration, if it was made with "actual intent . . . to hinder, delay, or defraud . . . creditors." DCL § 276; *see In re Sharp*, 403 F.3d at 56.  By contrast, a "constructively" fraudulent conveyance occurs when a conveyance is made "without a fair consideration" by a debtor (1) who is or will thereby be rendered insolvent, *see* DCL § 273; (2) against whom an action for money damages is pending or a judgment in such an action has

been filed, *see* DCL § 273-a; (3) who is left with unreasonably small capital, *see* DCL § 274; or (4) who intends to, or believes he will, incur debts beyond his or her ability to pay them, *see* DCL § 275.[4]

Significantly, whether a plaintiff is proceeding on an actually fraudulent theory or a constructively fraudulent theory (or, as here, both), "fraudulent-conveyance liability may not attach absent some prejudice to a creditor of the transferor." *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 281 (2d Cir. 2004); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 n.10 (2d Cir. 1995) ("[A] transfer may not be challenged as fraudulent unless it prejudices the complaining creditor."); *Miller v. Forge Mench P'ship Ltd.*, No. 00-CV-4314 (MBM), 2005 WL 267551, at *4 (S.D.N.Y. Feb. 2, 2005) ("The New York courts have held consistently that to challenge a conveyance as fraudulent, a plaintiff must suffer prejudice or injury as a result of the conveyance at issue."). The New York Court of Appeals, over a century ago, explained that requirement in the context of secured and unsecured creditors:

> Should A. convey his farm to B. subject to a valid preexisting mortgage of five thousand dollars held by a third party, and B. subsequently dispose of it for a larger sum, out of the proceeds of which he pays the mortgage, he cannot be required to pay to the creditors the full value of the farm without deducting the amount due on the mortgage, for as to that sum the creditors have no equity. If the fraud had not been consummated, only the value of the property in excess of the mortgage could have been made available in payment of the claims of the creditors. *As to that interest secured by the mortgage, no wrong was done them*.

*Hamilton Nat'l Bank v. Halstead*, 134 N.Y. 520, 523 (1892) (emphasis added). Thus, for an *unsecured* creditor to make out a fraudulent conveyance claim, the creditor "must first plead . . .

---

[4] The parties agree that claims of actual fraud under DCL Section 276 are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, but dispute whether those requirements apply to claims of constructive fraud under DCL Section 273. (Defs.' Mem. 13; Pl's Mem. 15; Defs.' Reply 5-6). The Court need not, and does not, address that dispute.

that . . . some portion of the debtor's assets would have been available to satisfy the unsecured creditor's claims had there been no conveyance." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007); *see also Miller*, 2005 WL 267551, at *4.

Applying those principles here, Plaintiff's fraudulent conveyance claims must be dismissed because, while the Complaint alleges that Wells Fargo held a lien on all of Success's assets, it fails to allege that Success's assets exceeded the value of its secured debt to Wells Fargo. In its opposition papers, Plaintiff does not seriously argue otherwise. Instead, it argues that prejudice can be *inferred* from its allegations that (1) Wells Fargo held a lien on all of Success's assets (SAC ¶ 72), and that (2) Wells Fargo took a new lien on some of the Transferred Assets, which were then owned by Americo. (SAC ¶ 74). Those allegations, Plaintiff contends, "provide[] sufficient basis to infer that Success'[s] debt to Wells Fargo did not exceed the sum of its assets and debt to Deere and that the sale of the Transferred Assets for less than fair market value resulted in a delay to satisfaction of Success'[s] debt to Deere." (Pl's Mem. 22). On its face, however, the first allegation suggests no such thing. And Plaintiff fails to explain how Wells Fargo's taking a new lien on some of the assets sold to Americo says anything, one way or another, about the remaining amount of Success's debt securely held by Wells Fargo as compared to the overall, true value of Success's assets. In evaluating Defendants' motion, of course, the Court is required to "draw[] all reasonable inferences in Plaintiff's favor." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But the inferences urged by Plaintiff here are not reasonable.

In the alternative, Plaintiff argues that it was injured because, had Success received adequate consideration for the Transferred Assets, it would have brought the secured debt to Wells Fargo "closer to satisfaction" and, in turn, brought its unsecured debt "closer to being

paid." (Pl.'s Mem. 14).  Notably, however, the only legal authority Plaintiff cites in support of that argument is DCL Section 276 — a provision that concerns the intent required for a claim of actual fraud, not injury.  (Further, Plaintiff's argument is premised on Success having received inadequate consideration for the Success-Americo Conveyance, but — as noted — the adequacy of consideration is irrelevant to a claim of actual fraudulent conveyance.)  More fundamentally, the argument is either one about the risk of non-payment in the future — in which case, it is simply too conjectural and remote to satisfy the injury requirement, *see, e.g.*, *Ross v. AXA Equitable Life Ins. Co.*, No. 14-CV-2904 (JMF), — F. Supp. 3d —, 2015 WL 4461654, at *10-11 (S.D.N.Y. July 21, 2015) — or it is about non-payment more immediately — in which case it is valid only if the value of Success's assets exceeds its debt to Wells Fargo, an allegation that, as noted, is absent from Plaintiff's Complaint.  (S*ee* SAC ¶¶ 72-75; *see also* Wells Fargo Agreement 1, ¶ 6).  After all, if the value of Success's assets were less than, or equal to, its debt to Wells Fargo, then it would not matter what consideration Success received from Americo; whether it was adequate or not, the assets would not have been available to satisfy the unsecured debt to Plaintiff.

In short, Plaintiff fails to plead that it was injured by any of the allegedly fraudulent conveyances.  It follows that its fraudulent conveyance claims must be and are dismissed.

**B.    The Alter Ego Claim**

The Court turns next to Plaintiff's alter ego claim against Goodman.  (*See* SAC ¶¶ 97-118).  Under New York law, a court may pierce the corporate veil and hold a corporation's owner liable for its debts when "(1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or 'other wrong'; and (3) the fraud or wrong results in an unjust loss or

injury to the plaintiff." *In re Vebeliunas*, 332 F.3d 85, 91-92 (2d Cir. 2003). To determine whether the first element is met, courts consider the following factors: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. *See, e.g.*, *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997); *accord N.Y. State Elec. and Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212, 224 (2d Cir. 2014) (substantially the same). The analysis is heavily fact-intensive. *See, e.g.*, *Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, No. 00-CV-2798 (DLC), 2002 WL 31885795, at *9-10 (S.D.N.Y. Dec. 27, 2002). Further, the relevant "factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a [defendant] is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12-CV-5392 (GRB), 2015 WL 5719759, at *6 (E.D.N.Y. Sept. 29, 2015) (internal quotation marks omitted).

      Given those standards, the Court cannot conclude that Plaintiff's veil-piercing claim against Goodman fails as a matter of law. Plaintiff's allegations, in essence, are that Goodman dominated Success and — through payments to herself or Bruce Fine that were disguised as corporate expense payments (the May Expense Payments) — siphoned off Success's assets, rendering the company insolvent and unable to meet its obligations, including the royalty payments due to Plaintiff under the License Agreement. Specifically, Plaintiff alleges that

Goodman is the Chief Executive Officer, Managing Member, and majority owner of Success, owning at least an eighty percent interest in Success while her children own a minority interest (SAC ¶¶ 91, 93); in her tenure at Success, Goodman failed to observe corporate formalities (SAC ¶ 100); she commingled personal and corporate funds (SAC ¶¶ 102-03); she personally guaranteed Success's debt to Wells Fargo (SAC ¶ 108); she (with, perhaps, Fine) was the only employee of Success when she fraudulently transferred to herself (or Fine) corporate assets in the form of expense payments (SAC ¶¶ 109-115); and the transfer made Success unable to meet its financial obligations to Plaintiff (SAC ¶ 116). Those allegations, taken as true, are sufficient to plausibly allege that Goodman exercised domination and control over Success to commit a wrong that injured Deere, and the allegations relating to Goodman's fraudulent actions (SAC ¶¶ 109-115) are sufficient to meet the heightened pleadings standards of Rule 9(b) of the Federal Rules of Civil Procedure, which apply to claims of fraud. *See, e.g.*, *Ningbo Prods. Imp. & Exp. Co. v. Eliau*, No. 11-CV-650 (PKC), 2011 WL 5142756, at *6 (S.D.N.Y. Oct. 31, 2011).[5]

## C. The Successor Liability Claim

Finally, Plaintiff asserts that Americo is subject to successor liability because the "Success-Americo Conveyance was not an asset purchase, as purported in the APA," but a *de facto* merger. (SAC ¶ 90; *see also* Pl.'s Mem. 16-18). Under New York law, "the purchaser of a corporation's assets does not, as a result of the purchase, ordinarily become liable for the seller's

---

[5]   Although Plaintiff's allegations (or lack thereof) concerning the relationship between Wells Fargo's secured debt and Success's assets doomed its fraudulent conveyance claims, the same is not true for its alter ego claim against Goodman. That is because "[a] finding of liability on a fraudulent conveyance claim — which usually seeks to re-establish the *status quo ante* and set aside the challenged transaction — must be premised on a highly particularized showing of injury." *De Vos v. Lee*, No. 07-CV-804 (RLM), 2010 WL 277070, at *3 (E.D.N.Y. Jan. 19, 2010). Accordingly, "a plaintiff-creditor may be 'injured' for purposes of the veil-piercing doctrine but, because of the existence of prior liens, nevertheless lack standing to set aside a fraudulent conveyance." *Id.* at *2 (internal quotation marks omitted).

debts." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003).  The *de facto* merger doctrine, however, provides an exception to that rule.  *See id*.  A *de facto* merger results when a transaction such as a sale and purchase of assets, "although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'" *Id.* (quoting *Schumacher v. Richards Shear Co.*, 59 NY.2d 239, 245 (1983).  The common law recognizes certain hallmarks of a *de facto* merger, including: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).  The Second Circuit has held that, of these hallmarks, continuity of ownership is a necessary precondition to finding a *de facto* merger.  *See Cargo Partner*, 352 F.3d at 46 ("[W]e are confident that the doctrine of *de facto* merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership.").

Taking the allegations in the SAC as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff adequately alleges a *de facto* merger.  Plaintiff alleges generally that, with the APA, "Success conveyed all or substantially all of its corporate assets to Americo" and that Americo took over and continued the business operations of Success.  (SAC ¶¶ 52, 81-82, 84-86).  It further alleges that the two entities share the same vendors and customers, as well as the same management and personnel.  (SAC ¶¶ 86-87).  Moreover, after the *de facto* merger, "Success promptly ceased operations" and fired all staff save for Goodman and Bruce Fine, Success's CFO.  (SAC ¶ 88).  Defendants argue that the last point is inconsistent with Deere's breach-of-contract claims against Success, which are predicated upon Success being in operation

until at least May 2014.  (Defs.' Mem. 12; Defs.' Reply 5).  But a party is allowed to plead claims in the alternative.  *See* Fed. R. Civ. P. 8(d).  And in any event, the SAC can be read to allege that the *de facto* merger was not effective until after the May Transaction, in which case the allegations would not necessarily even be in tension with one another.  (*See* SAC ¶ 84).  Thus, the SAC alleges most of the hallmarks of a *de facto* merger.

Whether the SAC adequately pleads continuity of ownership in particular, however, is a closer question.  Although the classic example of a *de facto* merger involves the purchase of assets with shares of the purchaser's own stock, *see, e.g.*, *Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 535 (W.D.N.Y. 2001), the assets here were purchased for cash.  But the Second Circuit has given some indication that the continuity of ownership requirement should be read "flexibly," particularly at the pleading stage.  *Nat'l Serv. Indus., Inc.*, 460 F.3d at 215 n.5 (noting that the New York Court of Appeals might read the *de facto* merger standards "flexibly," at least in tort cases, such that "other indicia of control over or continuing benefit from the sold assets might . . . be sufficient to satisfy the continuity of ownership factor"); *Nettis v. Levitt*, 241 F.3d 186, 193-94 (2d Cir. 2001) (per curiam) (holding that the district court had erred in relying on the "sorts of formalities that the *de facto* merger doctrine ignores" in denying leave to amend to allege continuity of ownership), *overruled on other grounds by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006); *see also, e.g.*, *Gallo v. Wonderly Co.*, No. 12-CV-1868 (LEK) (RFT), 2014 WL 36628, at *14 (N.D.N.Y. Jan. 6, 2014) ("A failure to fully establish continuity of ownership in a proposed amended complaint is not fatal at this stage of the litigation."); *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 288-89 (N.D.N.Y. 2012) (adopting a flexible standard to find that the plaintiff stated a *de facto* merger claim, despite the fact that assets were purchased for cash, and denying the defendant's motion to dismiss); *Ortiz v. Green*

*Bull, Inc.*, No. 10-CV-3747 (ADS) (ETB), 2011 WL 5554522, at *8-11 (E.D.N.Y. Nov. 14, 2011) (similar).  Given that, and Deere's allegation that earn-out payments paid by Americo to Success constitute a "continuing benefit" (*see* Pl.'s Mem. 18 (citing SAC ¶¶ 58-59, 62, 83)), the Court concludes that Plaintiff's allegations are sufficient to survive Defendants' motion.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Plaintiff's fraudulent conveyance claims (Counts Six, Eight, and Ten) are dismissed, while Plaintiff's alter ego and *de facto* merger claims (Counts Seven and Nine) survive.  The Clerk of Court is directed to terminate Docket No. 28.

SO ORDERED.

Date: October 30, 2015
      New York, New York

JESSE M. FURMAN
United States District Judge